And at this time, we'll hear Wang v. The Hearst Corporation. Good morning. Good morning, Your Honors. May it please the Court, my name is Rachel Bien of Outland and Golden LLP, and I represent the Plaintiffs' Appellants. In Gladd v. Fox Searchlight Pictures, the Court recognized that some internships, when properly designed, can greatly benefit interns. However, it acknowledged that there are circumstances where employers can exploit unpaid interns by using their free labor without providing them with an appreciable benefit in education or experience in return. Do we decide this on the basis of the program that was created by Hearst or some other company that takes interns? Or do we look at the individual experience of each intern and decide separately whether that intern was an intern or an employee? In this case, Hearst moved against each individual, and so the Court has to look on a case-by-case basis at the experiences of these internships. To a large extent, some of their experiences were the same, and some of that was a feature of Hearst's program or, frankly, lack thereof. As this Court recognized in Gladd, an internship provider must do more than leave interns unsupervised to perform the day-to-day work of employees. Internships must be properly designed to offer appreciable benefits. Hearst's internships were not properly designed. There was no effort by Hearst to create an experience that primarily benefited the plaintiffs rather than its own employees. The District Court's grant of summary judgment to Hearst must be reversed for two reasons. First, it inappropriately resolved factual disputes rather than leaving the tasks to a jury. There was competing evidence regarding the second, third, fourth, and fifth economic reality factors and the ultimate primary beneficiary question that a jury should have weighed and resolved. Second, the District Court interpreted several factors contrary to their plain language, this Court's intent in Gladd, and the FLSA's remedial purposes. It should have broadly interpreted the factors in line with the FLSA's expansive employee definition. With regard to the second Gladd factor, the extent to which the internship provides training that is similar to that which would be given in an educational environment, there was sufficient evidence from which a jury could have concluded that Hearst's internships were educationally deficient. The plaintiffs received little or no supervision, mentoring, or feedback. Some received no training from employees at all, but instead learned their duties from other interns. They did a lot of routine work, including administrative work and manual labor in the fashion closets. They did not shadow or regularly observe employees doing their work, and often worked only with other interns. They were exposed to a small slice of what goes on at Hearst Magazines without understanding the context of what they were doing or gaining access to the full picture. And they did not have learning opportunities throughout their internships because they performed the same tasks day to day. In the plaintiffs' own words, they were treated like they were, quote, disposable, told to be, quote, invisible, and felt, quote, anonymous. The practical skills they gained were basic and limited, how to be more organized, how to use Excel, and how to perform Hearst-specific processes. Well, why is that not useful? I mean, being more organized is something we can all use, and learning Hearst-specific procedures would teach somebody to adjust to the specific procedures of whatever company they ultimately become employed by. I would agree, Your Honor, that becoming more organized is helpful to everyone, but it's not the kind of educational or experiential benefit that this court— Isn't that what college tries to do as well? I mean, it may fail, but isn't that what college tries to do? It is a skill that college also teaches, and so it's not one that students can't learn in the classroom. Well, what if they needed the skill to do some of the work that they're asked to do and they don't have the skill? Is the mentor or employer, depending upon how this sifts out, supposed to say, well, you're supposed to be more organized, but I'm not going to teach you that because that will make this not an internship. This will make this a job. I mean, seriously, I don't understand how—I mean, first of all, the factual scenarios of these are all over the place, and so I don't see them as uniform, to be honest with you. But I don't understand how getting training or having someone work on getting better organized might not be relevant to someone's job. I could have a law clerk or an intern, because I take interns both in fall and the spring. And if I had an intern who was really poorly organized, I would have one of my clerks say, let's work on Patrick's organization. That's part of the job, isn't it? Let me try to respond to what you're saying. I mean, these interns didn't—employees from Hearst didn't sit down with them and teach them methods for becoming more organized. They didn't explain, here's how to do this project better than you just did it. They learned how to be more organized because they were left alone and had to figure things out for themselves. But even assuming that an employee did sit down and tell them how to be more organized, we're not saying that that's not a skill that's beneficial to the intern. What we're saying is, as a matter of law, it's not enough to preclude these plaintiffs from going to a jury in light of all the other facts weighing in their favor. That's one factor on your side. Most of these interns worked during a period of time that was either correlated or correlated well to their academic schedules, too. Most of these interns worked in the summer in between semesters, didn't they? Two worked during—excuse me, three worked during the summer. Rappaport, Spencer, and Wagster, right? That's right. So that's one factor. The fact that it correlates to the timing of an academic year is one factor that weighs more towards the side of looking at this as an internship, doesn't it? Well, we argue that, in fact, this factor should be considered neutral and not favoring either party because the factor looks at whether or not there was an academic schedule to accommodate, and here they were not actually . . . So you say it's neutral. Who makes that call? Who makes the call, the district court judge or us? Well, the court . . . The district court judge made that call, right? . . . is looking at this issue de novo. Excuse me, the district court judge made that call, right? Yes. The district court said it was neutral with respect to one of the plaintiffs, Wagster, who was not in school at the time he interned. Right. I remember that. Right. So now, what level of deference are we to give to that determination? Well, that was a legal determination, so the court shouldn't give it deference. It should look at the issue de novo. That it's neutral? Yes. In the context of the other seven factors and understanding how this ends up, it sounds to me like when you've got seven factors that are mixed questions of law and fact, this one isn't because it's a straight up . . . everybody agrees what the fact is, so then the question is what's the legal implications of it. When you're balancing all these and coming up to a conclusion, it sounds to me like it's a judgment call, isn't it? Well, the weighing of the factors is something that the jury would do because, first of all, as we argue, within each factor there are factual disputes which a jury should have resolved. Well, I understand that. If there were disagreements with regard to material issues of fact and understanding what a person did or didn't do, I get that. But if there's no disagreement about what they did or didn't do but what the implications of it are, for example, some of your folks characterize some of their work as scut work or just kind of dredge work, regular kind of work, not correlated, and the court acknowledged that to some degree. But is that a material issue of fact? The implication is an inference that the evidence raises. So even if the historical facts in that example are not disputed, the inference raised from those historical facts and how it answers the GLAD factors which look at the extent, the extent, those are questions of fact as well. And those inferences need to be interpreted in light most favorable to the plaintiffs. The inferences are for the jury alone. The inferences, because they're conflicting inferences that the historical facts give rise to, that's a jury question. And if I may, Your Honor, and I know that my time has run out, if I may just respond, Judge Jacobs, to one point that Judge Wesley made. You said that these internships were all different and all over the map. Now, we're not telling you that you have to evaluate each intern's internship as if they were the same. Rather, we would ask you to do the opposite. We want you to look at the record. I wasn't being critical of you in the sense of you're characterizing some of them as having the same characteristics. I was, let me be clear, I was simply noting that there are somewhat different factual scenarios for each of them. I mean, it's hard to keep track of all these, what they did or they didn't do. So I didn't offer that as a criticism of what you said. I wouldn't want you to think that. Thank you, Your Honor. on the idea that it is a jury that has to do the weighing in order to determine whether a particular person is or is not an employee. Well, that is well established in this court's case law with respect to other economic reality tests that it's adopted. They're the historical facts with respect to each factor, but then the inference is raised by those facts. Every intern or person who claims that they were treated, that they were paid as an intern, not at all, but was really an employee, gets to go to a jury. No, it depends on what the facts are in the record. And here what we've done or we've tried to do is point out that with respect to four of the economic reality factors, sorry, five of the economic reality factors, there are facts from which a jury could resolve each one in the plaintiff's favor. When does a judge, a court, make the determination as to whether somebody is an employee and when does a jury do it? Well, under a Supreme Court precedent, this court's precedent for summary judgment cases where the facts point in one direction only. I mean, there certainly could be circumstances where these factors did not have conflicting evidence on either side. There could be circumstances where they clearly point in the direction of an employment relationship or, by contrast, an intern relationship. And that's just not the record here. So we're not saying it could never be a summary judgment case. I have one question, if I may, Judge Jacobs. We've had the benefit of amicus brief from several unions, and of course yours is a class action. So I want to ask you just generally if you could describe who are your clients exactly. In the case currently, there are the five interns who have brought this appeal. It's a class action, right? It's not a class action. The class was never certified, and the collective was decertified when this case was previously on appeal. When we went back to the district court after the first appeal, Hurst chose to move against the plaintiffs remaining in the case for summary judgment. In terms of a renewed motion for class certification that has not been filed yet, it's something we did say that we wanted to do, not on the same terms as the motion that we previously filed in the case, but that hasn't been adjudicated in this case. What is it that you want to do again, or you hope to do? Well, what we expressed to the district court, and we didn't have the chance to explore this, was to narrow the class definition significantly from where it was in the beginning. So you'd like to revisit the question of class certification? We haven't. When we were before the district court before the summary judgment motions, we did wish to revisit it, and I can't say that we necessarily would do that if we go back to the district court. I'm just wondering, really, if you were to prevail, and if it were a class action, in what sense are you serving the interests of those who are called interns? I would think that the net result of all of this, of your success, would be that Hurst and every other company that has interns would stop having interns. Your Honor, the fact is that companies, even we've been bringing these cases for a while, the GLAD case was several years ago, haven't stopped using interns, and many have started paying their interns. Others change from an internship to a paid fellowship program. Others, like Hurst, continue to have interns who are not paid. So this case didn't end internships by any means. What's a paid fellowship arrangement, and how does that differ from being a person paid as an employee under the Fair Labor Standards Act? I think that different organizations have different systems for doing that, but my understanding is that the payment at least meets the minimum wage requirements under the FLSA. Of course, there could be some that don't, but I haven't explored those personally. So they satisfy the Fair Labor Standards Act, but they don't have to take the person on as an employee with all that that might imply otherwise. I'm not really sure that I can really speak to it specifically. I don't know the extent to which they're taking on those other burdens. We shall hear you on rebuttal. Thank you, Your Honor. Thank you very much. Good morning. May it please the Court? Jonathan DeNilla on behalf of Hurst. I'd like to start just with a proposition that this really is a question of law at this point. We are dealing with a record that is filled with undisputed facts. If you go through the 56-1 statement, you will see admit on virtually everything in there, and it is supported by the plaintiff's own testimony. So we have a very clear record here. And to go to the question Judge Wesley was raising about what is the determination here and what facts are left, Judge Etkin very carefully, very thoroughly went through the 56-1 statement, referred to the undisputed facts, and made findings which should be deferred to by this Court under its own precedent under the Meyer case and under Zhang in terms of determining what the extent, the existence and the extent of different factors in the FLSA case. But even on a de novo review or however you might look at these, they are really clear on their face. And this is precisely the sort of balancing and weighing that courts do all the time in the FLSA context, granting summary judgment in the independent contractors with respect to joint employers, with respect to other FLSA standards. Also, with respect to unpaid internships specifically, we have the Hollins case out of the Seventh Circuit which was a grant of summary judgment to defendants in an intern case that was affirmed since we submitted our briefing. We had cited to the district court case, the Kaplan case out of the Eleventh Circuit, the Wright case out of the Ninth Circuit. And in this circuit, Judge Caproni's decision in Mark v. Gawker in the Southern District. So there is a wide body here in terms of applying these GLAD factors and applying the primary beneficiary test under totality of the circumstances defined that an internship is legal. Do we do this intern by intern or, as it were, employee by employee? Or do we do this based on the Hearst program? Recognizing that sometimes the Hearst program misfires and people get a lousy experience. It happens even if you're an employee. I think you do it intern by intern, Your Honor. Certainly the program can be and is relevant, and you'd said that with respect to class and the GLAD decision. But on an intern by intern basis, if you want to look at the educational value or the benefit to the interns, I think if you go to the 56-1 again, and you compare what the interns went to their schools and told them that they were going to be learning and what they did, they match up. How many of the five got credit? Did three of the five or four of the five get credit? Excuse me. Were available to get credit? Because at least one was eligible to get credit but didn't take the credit or something, as I recall. Is that right? All five had received notice from their schools that they were eligible to receive credit for these internships. At the end of the day, three did receive credit. And does the record reflect how the internships came to be? Was it the students went to the school and said, I would like to do this, and did they have to submit some kind of document that laid out exactly what they were going to do? Yes, that's exactly right. So in the case of Ms. Wang, and this is in the appendix at page 770, she described her internship duties and activities to the school in advance and said exactly what she thought that she was going to engage in, contact between editors in showrooms and studios, online research, cataloging and trafficking samples, storyboarding photo shoots, maintaining accessories closet. And then on page 771 of the record, it makes clear that she admits that she did all of those things. In fact, that was mentioned by the court in its decision to learn to create storyboards, manage fashion and accessories, prepare expense reports, and obtain a photo shoot. That's right. And Judge Etkin went through all of these facts. And the same thing is true with Ms. Spencer. She also described her expected duties and activities to the school. That's at page 749. And then she admits that she participated in all of them. That's at page 751. The same is true of Ms. Wheels. Mr. Wagster also, it's in the record that he explained the nature of what he would be doing to his school, which he would be focused on administrative tasks. Again, he admits that's what he did. He also did other things. He had never arranged a professional marketing event, and he worked on several of them. He also attended regular team marketing meetings. And Ms. Rappaport, she also, in 56-1, makes it clear that she pitched the internship to her school, that she wrote journal entries and did a final paper along the way, and admits to also that she learned. What do you say to the argument that an intern may learn this or an intern may learn that, but that's like one thing, and if that's what you're doing the whole internship, you kind of run out of steam in terms of learning anything. You're just, at a certain point, it becomes routine and stops being a learning experience. I think, Your Honor, that that's why you have to look at all of the factors together, and I think that's exactly what this Court said, and glad that that may be possible. There's certainly an educational experience to repeating different tasks also and gaining mastery of them. Also, sometimes one thing builds upon another. So, for example, Ms. Wheels, who had an editorial internship, through doing different tasks it led up to her actually being able to take on the tasks of one assistant and being able to publish stories. It was a cumulative impact over the course of the semester. With respect to Ms. Spencer, she, at the end, had satisfied her goal of actually casting a model shoot for a spread in the magazine, which, again, was through demonstrating her responsibility and her competence over the course of a period of time. But taking that back, these were relatively short internships. Each and every one of them was over the course of a summer or a semester. Except for Wangs. Wangs was a whole year, wasn't it? No, Wangs was not a whole year. She began in August, and she ended in December. So hers was only a month over a semester. And the same thing with Mr. Wagster. So all of these were coextensive with a semester. And this just goes to show how Judge Etkin very carefully and conservatively gave every inference to the benefit of the interns. Because with respect to Wagster and Wang, he gave the duration element, factor four, to them, even though they were only a month over a semester. So in the totality of the circumstances, again, if you go back here, all of these point towards an academic experience and a learning experience as opposed to . . . Let me ask you something about the totality of the circumstances and Judge Etkin's decisions. Didn't he say that several of these decisions of his were close calls? He did, Your Honor. It strikes me that if it's a close call and we're considering all of the circumstances, that sounds very much like a question of fact rather than a question of law. Well, Your Honor, these were close calls based on undisputed facts. This is not a case like Valez, for example, dealing with the domestic employee, where there were two versions of events as opposed to whether or not she was expecting compensation. What we're talking about is undisputed facts about what they actually did that go to each one of these factors. All that you're talking about in terms of dispute at this stage is characterizations, which is very much like this court in the Pippins v. KPMG case said that ultimately, what the parties were fighting over was how to characterize the facts. And that really goes to a judicial determination. That's exactly what the court should be doing, especially when it goes to the extent of these factors. And Ms. Bien actually said just before that determining the extent of these factors and how these facts go to the factors is a legal determination, which is contrary to what she argued in her brief but what she's just said right now. Is it a judge or is it a jury that ordinarily would decide whether an employment relationship exists? On undisputed facts where there are no determinations to be made as to disputes of material fact, it's absolutely a judge. And that is what this court said in Zeng. It's what the court has done in various context. What if there's an issue of weighing at the end? That's absolutely a judicial determination. That's what courts do all the time, and that's what's reflected throughout this court's precedents. And in terms of the whole weighing exercise, too, one of the things that I think this court did in establishing the GLAT standard also, going back to the totality of the circumstances and the economic reality, is that it set some hard targets. There are some more objective factors here which make very clear when they're not dispositive and they're not exclusive, but when you have an intern who has accepted a position without pay and without the expectation of a job and is a student who will be returning to school after a semester or after a summer, that's a very good indicia that this is not an employment relationship. And the other factors in terms of training, duration, displacement, can all provide important safeguards against exploitation and abuse, but there is no evidence in the record of any of that here. Thank you. Thank you, Your Honor. We'll hear rebuttal. I just want to clarify a point that my colleague made. I think that there's a misunderstanding here about the various factual questions. There are the historical findings of fact, which to some extent were not in dispute largely, and that is what Mr. Dinellon is discussing. However, there are the inferences that those historical facts give rise to. In the Zhang case, the court clearly stated this. First, there are historical findings of fact that underlie each of the relevant factors. Second, there are findings as to the existence and degree of each factor. So that is a finding of fact. We are arguing that there were facts on both sides of the ledger with respect to several of the economic reality factors, and the existence and degree of each factor is something that Judge Etkin shouldn't have done. He should have left that to the jury. You're not saying that Judge Etkin made a finding of fact that was somehow disputed. You're saying he interpreted the facts in a way that you think was an inference which should be left to the jury. Is that it? What he did was he weighed the facts against each other. For example, on the issue of the second factor, the extent to which the training resembles training in an academic setting, there were many facts that we identified that I alluded to here that show that they were dissimilar from the experiences the plaintiffs had in their hands-on experiences. I understand, but in his opinion, he discussed how you understand that or how you look through it. He discussed with regard to the level of training that there was criticism that there wasn't enough review of what they were doing. And he said, well, look, the fact that they didn't do it as well as other people would do doesn't mean that they didn't do it. It's just that they didn't do it as well as others would do. I mean, in his opinion, are there any facts that he found that he used to decide as a matter of law? Because that's what his conclusion is at the last page of his writing. He found as a matter of law that they were not employees. Are there any facts upon which he premised that that were wrong? Not the inferences from them, but the facts that he made that conclusion. Yes. I mean, there were many instances that we tried to point to in our briefs where the facts that he read from the record were exaggerated or weren't even there, and we cited to some of those. In terms of the things that these interns learned. In their testimony, they don't describe learning the things in the way that the judge said they did. And so, to a large extent, he exaggerated the benefits, the practical benefits that these interns got. How can the issue turn upon what people learn rather than the opportunities that people have to learn? After all, otherwise people would be getting refunds from their colleges. Your Honor, we're not saying it hinges on what someone learned versus someone else learned. We're talking about what opportunities did they have to get training? What opportunities did they have to get benefits? They didn't. This was not a real training program. What happened was they were given assignments. They were either trained by other interns or given very cursory training from an employee and then left to do those assignments. They got orders. They did them. They sent their email back. And they got more assignments. That's what this involved. This was not someone sitting down. Well, why isn't that training in being a self-starter and having initiative and figuring things out? I mean, that's what people do. That's what makes you valuable. That's what somebody does in a job. But it's not the kind of educational training that being an intern is supposed to entail. And I'd be happy to point to an example of a contrast that I think is very meaningful. My colleague spoke about the Gawker case. It's a district court case from here in the southern district of New York. We have the cases. Okay. I think that it's a very telling example of what this particular internship provided that was lacking here. And if I may just point that out, Your Honors. Go ahead. In the decision, the plaintiff there was Mark. His editor there provided mentorship and opportunities to learn journalism skills that were not offered to full-time employees who were expected to already possess an advanced journalism degree. He gave him a larger-scale reported work, worked with him over many weeks in drafts, tweaking things, encouraging him to do more reporting. The resulting story was published and gave the intern a byline. Here, where the plaintiff did actually produce work product, that her publisher didn't get any kind of byline or anything. In that case, it was determined that that intern was an intern as a matter of law. Exactly the same. Was there any weighing that took place in that case? In that case, the facts, as I've been recounting, pointed only in one direction. It wasn't a close call, as Your Honor pointed out. Here, the facts only slightly favored one party. Even if the judge believed that these plaintiffs were interns, a jury could find the opposite result. Thank you. Thank you both. We'll reserve decision. Thank you.